**Seidman v. Caplan**

---

*John C. Fenningham and Mark C. Labrum,* for plaintiffs

*Chad E. Kurtz,* for defendants

NEW, *J.,* June 13, 2013—This appeal and cross appeal arise from this court's denial of post trial motions and

motions in *limine*. For the reasons set forth below the court's orders should be affirmed.[1]

## A. Seidman Partnership

The Jacob and Merrill Seidman Partnership (hereinafter "Seidman Partnership") is a Pennsylvania partnership originally formed by brothers, Jacob Seidman and Merrill Seidman (hereinafter "Seidman"), each of whom owned a 50% interest. After Jacob Seidman's death in February 2002, his 50% interest in the Seidman Partnership passed to his estate and was purchased by Seidman (49%) and Seidman's wife Ruth (1%).

On October 28, 2009, Ruth Seidman assigned her 1% interest in the Seidman Partnership to the Ruth Seidman Revocable Living Trust. On January 1, 2010, Ruth Seidman passed away. At the time of her death she did not own a 1% interest in the Seidman Partnership. On April 7, 2010, defendants filed a suggestion of death with the court for Ruth Seidman. On October 18, 2010, the beneficiaries of Ruth Seidman's will and the beneficiaries under the Ruth Seidman Revocable Living Trust executed a Family Settlement Agreement which returned the 1% Seidman Partnership interest to the estate of Ruth Seidman.

On October 28, 2010, MS&RS purchased the 1% Seidman Partnership interest from the estate of Ruth

---

1. The parties submitted statement of matters complained of on appeal in accordance with the court's order. Plaintiffs' statement complained of factual and legal errors in the court's denial of plaintiffs' post trial motions, including the request to award attorney fees. Plaintiffs' further complained the court erred in granting defendants' motion in *limine* to preclude evidence of a distribution shortage. Defendants also submitted a statement of matters complained of on appeal. Defendants complained the court erred in denying their post trial motion including the posting of security.

Seidman. MS & RS is a partnership between Merrill Seidman and Ruth Seidman. Seidman owns a 99% interest in MS&RS. (N.T. September 27, 2011 p. 51). Philip B. Goodman is a general partner of and owns a one percent (1%) partnership interest in MS&RS.

## B. Background

Seidman has been involved in the real estate business since after World War II. (N.T. September 27, 2011 p. 48-49). Seidman's experience in the real estate business included entering into brokerage agreements, speculation on properties, mortgage lending and other forms of banking activities. (*Id.* at p. 50). Seidman and his brother Jacob Seidman were directors of Delaware Valley Savings and Loan until 1989. (N.T. September 27, 2011 p. 49). Seidman and Jacob also formed Delaware Valley Mortgage Company, a partnership, which provided short term loans to real estate speculators. (N.T. September 27, 2011 p. 50). Seidman graduated from Temple University with a degree in business. (N.T. September 27, 2011 p. 50-51).

## C. Ronald A. Caplan, PMC/Washington Square Partners GP, LLC and Roosevelt's, Inc. d/b/a Philadelphia Management Company and their prior relationship with Seidman.

Defendant Ronald A. Caplan (hereinafter "Caplan") organized the limited partnership of Washington Square Partners (hereinafter "WSP") and is the general partner of WSP. Defendant PMC/Washington Square Partners GP, LLC is a limited liability company and is a past and present general partner of WSP. Caplan is the President of PMC Property Group, Inc. d/b/a Philadelphia Management Company. Defendant Roosevelt's, Inc. d/b/a Philadelphia

Management Company is a corporation and tenant of WSP. It is also a real estate management company. Seidman and his brother Jacob met Caplan in 1983. (N.T. September 27, 2011 p. 52). In the past, Caplan purchased property from Seidman and Seidman and his brother held the mortgage on the property which was paid off in full. (N.T. September 27, 2011 p. 53).

D. Washington Square Partners

Caplan approached Seidman to finance the purchase of the Farm Journal Building. (N.T. September 27, 2011 p. 53). On December 30, 1996, a limited partnership agreement was executed by and between Ronald Caplan, the general partner, and Max Berger, a limited partner, David W. Nyberg, a limited partner and Jacob Seidman and Merrill Seidman, a Pennsylvania partnership, special limited partner to form the limited partnership of WSP. (Trial exhibit "p-8"). Seidman was represented by counsel during the start up of WSP. (*Id.*).

The purpose and character of WSP is to "acquire, lease, own and dispose of real and personal property for investment and income, including without limitation the property located at 230-34 Washington Square, Philadelphia, Pa. and in connection therewith to manage, mortgage, develop, operate, lease or otherwise deal in such property." (*Id.*). The schedule of partnership interest in WSP at the time of formation was as follows:

General Partner, Ronald Caplan, - 55% partnership interest,

Special Limited Partner — Jacob and Merrill Seidman - 20% partnership interest

Limited Partner, Max Berger - 15% partnership interest

Limited Partner, David W. Nyberg - 10% partnership interest. (Trial exhibit "P-8").

The Seidman Partnership made a capital contribution of two hundred thousand dollars ($200,000.00) to WSP. Berger and Nyberg did not make any capital contributions to WSP. On December 20, 1996, WSP purchased the Farm Journal Building for $1,000,000.00 with the capital contribution made by the Seidman Partnership and a loan of $800,000 from Delaware Valley Mortgage Company ("DelVal").[2] Caplan executed a promissory note as the general partner of WSP for the $800,000 loan.

E. Sale of the Farm Journal Building

On June 18, 1997, WSP sold the Farm Journal Building to Pennsylvania Hospital. The limited partners of WSP consented to the sale of the Farm Journal Building. On June 19, 1997. Caplan, on behalf of WSP agreed to purchase the real property at 1411 Walnut Street, Philadelphia, Pa. from S-L Walnut, L.P., an entity Caplan founded and owned in part. The Seidman Partnership agreed to defer receipt of proceeds from the sale of the Farm Journal Building for a tax free exchange. (Trial exhibit "D-15"; N.T October 12, 2011 p. 82-83). Each of the limited partners of WSP agreed to reduce their interest in WSP from the date of the exchange to a *de minimus* percentage for the purpose of the tax free exchange. (N.T. September 28, 2011 p. 40-41; N.T. October 12, 2011 p. 86-88, 90-91, 10-13-11 p. 96. 102-103, D-133, D-74). Following the sale of the Farm Journal Building, the Seidman Partnership received

---

2. DelVal is a Seidman run mortgage company.

$200,000 as a return of capital.

On August 21, 1997, limited partner, David Nyberg holding a 10% interest in WSP. together with Caplan and Annette Billups, an executive employee of Caplan, executed an assignment and assumption and a transfer agreement (Trial exhibit "D-70"). Nyberg assigned a 9.5% interest in WSP to Caplan (4.5%) and Billups (5%). After the assignment, Nyberg retained a .5% interest in WSP. (Trial exhibit "D-69"). Billups received 5% interest in WSP based on "sweat equity". Other than sweat equity Billips did not make any capital contributions. (N.T. October 4, 2011 p. 30-31).

On December 18, 1997, WSP completed the like kind exchange and WSP became the owner of real estate located at 1411 Walnut Street, Philadelphia, Pa. (N.T. October 12, 2011 p. 96). On March 16, 1998 and March 19, 1998, the Seidman Partnership received distributions in the respective amount of $400,000 and $200,000 from the Farm Journal Building Sale. Caplan was entitled to a distribution of approximately $1.3 million for his share of the profits from the sale of the Farm Journal Building. Caplan's share of the proceeds from the sale of the Farm Journal Building remained in WSP to fund a portion of the tax-free exchange.

F. Seidman's Assignment of its Partnership Interest in WSP

On January 1, 1998, the Seidman Partnership assigned 19.5% of their interest to WSP. Philip Goodman ("Goodman"), the Seidman Partnership's accountant, acknowledged the existence of the assignment and confirmed the Seidman Partnership's interest as .5% in

WSP after the assignment. (Trial exhibit "D-1"). Goodman was informed by Seidman that the Seidman Partnership's interest was .5% in WSP. (N.T. October 12, 2011 p. 10, 15). Goodman was a credible witness.

G. Lubert-Adler Note

On June 17, 1998, Caplan, on behalf of WSP, executed and bound WSP to a $750,000 promissory note. (Trial exhibit "P-101"). The promissory note is referred to as the Lubert-Adler Note. The terms of the Lubert-Adler Note provided for the payment of interest at the rate of 10% per annum, 20% cash flow from the 1411 Walnut Street property and 20% of the net proceeds of the sale or refinance transaction. (Trial exhibit "P-101"). The Lubert-Adler note was necessary for WSP's existence.

The Lubert-Adler note provided WSP working capital (N.T. October 11, 2011 p. 104-118) and assistance with tenants such as Morton's Steakhouse, Mellon Bank, and Eddie Bauer. (N.T. October 4, 2011 p. 161-162). Caplan provided WSP with the funds to pay off the Lubert-Adler note. (N.T. October 12, 2010 p. 102; trial exhibit "P-102"; N.T. October 11, 2011 p. 118). The principle sum of $750,000 plus $1,971,976 in interest was paid to Lubert-Adler on October 7, 2007. (N.T. October 5, 2011 p. 146).

H. Crusader Bank as an Investor Limited Partner in WSP

Crusader Bank (hereinafter "Crusader") was an additional investor in WSP. On December 24, 1998, an amended and restated agreement of limited partnership was executed by Caplan, the limited partners and the Seidman Partnership. The December 1998 agreement

stated its purpose as acquiring, developing, financing, rehabilitating, owning, maintaining, operating and selling or otherwise disposing of a building consisting of 80 apartment units and 24,000 square feet of commercial space located at 1411 Walnut Street. (Trial Exhibit "P-9"). The December 1998 agreement also stated the parties desired to continue the partnership, admit Crusader as an investor limited partner, reallocate the interests of the partnership and restate all of the provisions governing the partnership. (*Id.*). The Seidman Partnership executed the 1998 December agreement. (*Id.*). The 1998 December agreement acknowledged assignment of portions of Seidman Partnership's interest in WSP to Caplan. (Trial exhibit "P-9").

Upon execution of the December 1998 agreement, WSP's interests were as follows:

Ronald L. Caplan, General Partner .10%

Max Berger, Limited Partner .02%

David W. Nyberg, Limited Partner .02%

Jacob and Merill Seidman, Limited Partner .04%

Annette Billups. Limited Partner .02%

Crusader Bank, Investor Limited Partner 99.80%

The capital contribution to WSP by Crusader was $1,377,157.00. (Trial exhibit "D-89").

I. Relevant Portions of the December 1998 Agreement

The December 1998 agreement provides "the aggregate amount owed by the Partnership to the General Partner or

any of its Affiliates for amounts advanced by any of them to or on behalf of the Partnership, is $1,300,000." (Trial exhibit "P-9"- article IV, section 4.01(r)). The $1,300,000 referenced in section 4.01 (r) of the December 1998 agreement represented Caplan's share of the proceeds from the sale of the Farm Journal Building that were reinvested into the partnership to acquire and rehabilitate 1411 Walnut Street. (Trial exhibit "P-170").

The December 1998 agreement further provides:

Except as otherwise set forth in this Agreement, the General Partner, within the authority granted to it under the Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Partnership for the purposes stated in Article III, shall make all decisions affecting the business of the Partnership and shall manage and control the affairs of the Partnership to the best of its ability and use its best efforts to carry out the purpose of the Partnership. (Trial Exhibit "P-9" — Article VIII, section 8.01(a) of the 1998).

Section 8.02 (a)(iv) of the December 1998 agreement provides:

The General Partner shall not have any authority to... (iv) to borrow from the Partnership or commingle Partnership funds with funds of any other Person; provided however, to the extent that the proceeds of the Permanent Mortgage Loan are not needed by the Partnership to repay the Construction Loan, or otherwise, 95% of such excess proceeds may be borrowed by the General Partner, the Developer or Affiliates of either of the foregoing, on such terms as

the General Partner deems appropriate.

Section 8.04 of the 1998 of the December 1998 agreement provides:

> The General Partner may delegate all or any of their powers, rights and obligations hereunder, and may appoint, employ or contract or otherwise deal with any person for the transaction of the business of the Partnership, which Person may, under supervision of the General Partner, perform any acts or services for the Partnership as the General Partner may approve.

Section 8.05 of the December 1998 agreement provides:

> Subject to Section 8.14, the General Partner or any Affiliate may act as Management Agent on terms and condition's permitted by any applicable regulations, and may receive compensation at the highest rates approved and permitted by any applicable regulations at the time highest rates approved and permitted by any applicable regulations at the time such compensation is paid.

Section 8.06 of the December 1998 agreement provides:

> The General Partner and any Affiliates thereof may engage in or possess interests in other business ventures of every kind and description for their own account, including without limitation, serving as general partner of other partnerships which own, either directly or through interests in other partnerships, government-assisted housing projects similar to the Apartment Complex. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in or to such other business ventures or to

the income or profits derived therefrom.

Section 8.07 of the December 1998 agreement provides in pertinent part:

Neither the General Partner nor the Investor Limited Partner shall be liable, responsible or accountable in damages or otherwise to any of the Partners for any act or omission performed or omitted by him or it, or any of them, in good faith on behalf of the Partnership and in a manner reasonably believed by him or it or any of them to be within the scope of the authority granted to him or it or any of them to be within the scope of the authority granted to him or its or any of them by this Agreement and in the best interest of the Partnership, except for gross negligence, willful misconduct, fraud or any breach of fiduciary duty as General Partner or Investor Limited Partner with respect to such acts or omissions.

Section 8.14 of the December 1998 agreement provides:

The Partnership with the approval of the Lender, if requires, shall engage such person, firm or company as the General Partner may select (hereinafter referred to as "Management Agent") to manage the operation of the Apartment Complex during the rent up period and following Final Closing. The Management Agent shall be paid a management fee subject to the management approval of the Lender, if required. The contract between the Partnership and the Management Agent and the management plan for the Apartment Complex shall be in a form acceptable to the Lender, if required, Philadelphia Management shall be the initial Management Agent.

Section 8.18 of the December 1998 agreement provides in part:

> *General Partner's Option.* The Investor Limited Partners grant the General Partner an option to acquire all, but not less than all, of their Interest on the date upon which a Tax Credit Recapture event can no longer occur...

On January 7, 1999, the Seidmans received the final payment of proceeds from the sale of the Farm Journal Building in the amount of $34,535.00.

J. WSP Contracts-Management of the Properties

On December 24, 1998, WSP entered into a development agreement with Roosevelt, Inc. d/b/a Philadelphia Management and Lubert-Adler partnerships entities (herein after "the developer"). (Trial exhibit "D-87").[3] Philadelphia Management Company (hereinafter "PMC") is solely owned by Caplan. (N.T. October 42, 2011 p. 122-123). The developer was retained to use its best efforts to perform certain services with respect to 1411 Walnut Street including renovations, acquisition of necessary building permits, financing and historic rehabilitation tax credits for the project. (Trial exhibit "D-87").

The December 1998 agreement provided as follows:

> The Partnership has entered into a Development Agreement of even date herewith with Roosevelt, Inc. d/b/a Philadelphia Management and Lubert-Adler

___

3. The Lubert-Adler partnership entities are identified in the development agreement as Lubert-Adler Real Estate Opportunity Fund, L.P., Lubert-Adler Real Estate Opportunity Fund II, L.P. and Lubert-Adler Capital Real Estate Opportunity Fund.

Real Estate Opportunity Fund, L.P. Lubert Adler Real Estate Opportunity Fund II, L.P. and Lubert Adler Capital Real Estate Opportunity Fund (collectively "Developer") for their services in connection with the development and rehabilitation of the Apartment Complex. In consideration of such services and for the assignments to the Partnership pursuant to Article VII above, a fee in the total amount of $1,377,157 shall be payable by the Partnership to the Developer pursuant to the terms of the Development Agreement and in accordance with Section 11.01 hereof. (Trial Exhibit "P-9" Section 8.10(a)).

The Development agreement provided for payment as follows:

Owner shall pay a development fee in an amount equal to $1,377,157 of which $1,101,726 shall be paid to Philadelphia Management and $275,431 shall be paid to the Lubert-Adler Partnerships in the following percentages: Lubert I-21.834%; Lubert II-65.2949% and Lubert III-12.861%. The development fee shall be payable in two installments as follows: (i) $1,070,668 shall be paid upon the earlier of December 31, 1998 or the payment by the Investor Limited Partner of the Partnership of the second Installment of its Capital Contribution of which $856,534 shall be paid to Philadelphia Management and $214,134 shall be paid to the Lubert-Adler Partnerships in the percentages set forth above, and $306,489 shall be paid upon the earlier of December 31, 1999 or the payment by the Investor Limited Partners of the Third Installment of its Capital Contribution to the Partnership of which $245,191 shall be paid to Philadelphia Management and

$61,298 shall be paid to the Lubert-Adler Partnerships in the percentages set forth above. (Trial Exhibit "D-87 section 3.1").

The developer only received fees if revenue was generated by the building. (N.T. October 5, 2011 108-109, 113-114). The revenue generated was limited to rent from the commercial tenants, including Eddie Bauer and Morton's Steak House of Chicago. (N.T. October 5, 2011 p. 109-112).

On December 24, 1998, WSP entered into an incentive management services agreement with the Lubert-Adler partnership entities to provide management services to WSP. (Trial exhibit "D-90"). The incentive management services agreement and the first amendment to the incentive management services agreement were never implemented. (N.T. October 4, 2011 p. 173). PMC provided all the services under the Incentive management services agreement, including accounting services. PMC became the manager of 1411 Walnut Street upon acquisition. Caplan determined that PMC was better qualified to act as manager and the cost associated with managing the properties was less with PMC. (N.T. October 12, 2011 p. 103).

K. Turnover Date/Certificate of Occupancy

The December 1998 agreement provides after the "Turnover Date", all profits, losses and distributions etc. are made 10% to the investor limited partner, .1% to all of the class A limited partners and 89.9% to Caplan, the general partner. (Trial exhibit "P-9", Article XI). Turnover date is defined in the December 1998 agreement as "five years following the later of (i) the certificates of occupancy

are issued for all apartment units and commercial space in the Property or (ii) the Accountants have certified the entire Property was placed in service for purposes of calculating Tax Credits." (Trial exhibit "P-9").

On February 25, 2002, John Rilling, CPA, of RSM McGladry, WSP's accountant, responded to a request by Crusader Bank for a certification as to the date the building was placed in service for purposes of calculating the tax credits. (Trial exhibit "D-110"). Rilling's letter certified the date the building was placed in service for purpose of calculating the tax credits was May 31, 1998. (*Id.*).

Caplan delegated to Ms. Billups the task of obtaining all the certificates of occupancy necessary for the residential and commercial occupancy of 1411 Walnut Street property. The tenants on the first and second floor were responsible for obtaining their own certificates of occupancy. Certificates of occupancy for all apartment units and commercial space in the property were issued as of July 7, 2000. (Trial exhibits "D-172, 183, 189").

A certificate of occupancy was issued by the city of Philadelphia in 1984 for the third floor. (N.T. October 12, 2011 p. 112). A new certificate of occupancy was not obtained for the third floor because there was no change in use and no sufficient amount of work done on the floor that required it. (N.T. October 12, 2011 p. 113). The third floor was used as an office for PMC. Upon inspection by the city of Philadelphia, city officials from the Department of Licenses and Inspection never raised questions concerning the certificate of occupancy for the third floor. (N.T. October 12, 2011 p. 114).

Prior to PMC's occupation of the third floor, the space

on one side was vacant for one year and the space on the other side was vacant for two years. (N.T. October 12, 2011 p. 120). Prior to PMC' occupation, Corcel was obtained as a tenant for one side of the space. Corcel was the tenant on this property for approximately five years. (N.T. October 12, 2001 p. 121). Corcel was paying between $9 and $10 a square foot. (N.T. October 12, 2001 p. 121). Once Corcel moved from the space, the space remained vacant until PMC expanded its occupancy to the entire third floor. (N.T. October 12, 2011 p. 122). PMC is paying $9.60 per square foot. (*Id.*).

The third floor space is not desirable office space because it is directly above a restaurant, the view is of the back wall and the office tenants are mixed in with the residential tenants in the building. (N.T. October 12, 2011 p. 122-123). The turnover date under the December 1998 agreement is July 7, 2005. The turnover date in connection with the historic tax credits means that a change in allocations and distribution would not affect the historic tax credit sold to the bank. After July 7, 2005, according to article XI of the 1998 December agreement, the allocations of profit, loss, gains and distributions would be 10% to the investor limited partner, 89.9% to the general partner and .1% to the class A limited partners.

L. Purchase of Crusader Bank's Interest

After Crusader Bank earned the historic tax credits, it sought to have its interest in WSP bought out. The agreed upon purchase price for Crusader Bank's interests was $538,000. (Trial exhibit "P-91"; N.T. October 12, 2011 p. 106). Caplan paid the purchase price for Crusader Bank's interest with his personal funds. (N.T. October 12, 2011 p.

106, 206-208; Trial exhibit "D-115"). Although paragraph 8.18 of the December 1998 agreement provided that Caplan had the option to purchase Crusader Bank's interest in WSP, the purchase agreement and transfer agreement documents memorializing the transfer of Crusader Bank's interest, dated as of September 1, 2004, were erroneously structured as a redemption of the interests by WSP, rather than a purchase of the interest by Caplan. The purchase price proceeds were recorded on the books of WSP as a loan from Caplan to WSP. The loan was subsequently paid off. (Trial exhibit "P-146"). The structuring of the transaction as a redemption of Crusader Bank's interest by WSP caused the accountants to calculate a reallocation of the remaining partners' ownership interest. (N.T. October 3, 2011 p. 100-101).

In preparing the form K-1 in connection with the preparation of the 2004 tax return for WSP, the accountants reallocated Crusader Bank's 99.8% interest to the remaining partners on a pro rata basis (50% to the general partner and 50% to the class A limited partners). The accountant's reallocation of the ownership interests resulted in a reported increase in the Seidman Partnership's ownership interests on its form K-1, as well as interests in profits and losses, from .04% to 20% for the tax year 2004. (Trial exhibit P-27).

M. The 2004 and 2005 K-1 Statements

The Seidman Partnership's WSP form K-1 statement for the tax year 2004 and 2005 reflected an increase in their share of capital, profit and loss from .04% to 20%. (Trial exhibit "P-24"). At the end, of 2006, Caplan reviewed the Seidman Partnership's K-1 statements and

realized the K-1's were incorrect. (N.T. October 12, 2011 p. 124). Caplan contacted Robert Weinstein (hereinafter "Weinstein"), Chief Financial Officer of PMC. (N.T. September 27, 2011 p. 178). Weinstein's duties include the financial management and financial operations of WSP and assuring the accuracy of WSP's books, records and Schedule K-1's issued to the partners of WSP. (N.T. September 27, 2011 p. 178, 180, 186, 188-189). Caplan directed Weinstein to correct the K-1's. (*Id.*). According to Caplan, the 2005 K-1 statement was incorrect because it failed to comply with article XI of the December 1998 agreement and it did not comport with the parties' agreement that the Seidman Partnership's interests would be .5%. (Trial exhibit "P-9").

Caplan prepared the first amendment to the amended and restated agreement of limited partnership in January 2006. (Trial exhibit "P-94"). The 2006 amendment reset the ownership interests of the general partner and the limited partners so that the Seidman Partnership collectively had a .5% interest. (N.T. October 6, 2011 71-72; trial exhibit P-"94"). Section 14.01 of the December 1998 agreement authorized Caplan to unilaterally amend the December 1998 agreement to memorialize the agreement with the limited partners regarding their interests as it should have been. (N.T. October 12, 2011 116-117, 124, 125, 157, Trial Exhibit "P-94"). The K-1 statements for 2006, 2007, 2008 and 2009 for each of the limited partners were issued consistent with the provisions of the 2006 amendment. (Trial exhibit "P-27", "D-35").

N. Payment of $1,300,000 to Caplan.

The December 1998 agreement, executed by the

Seidman Partnership acknowledged that Caplan had not yet obtained his distribution from the sale of Farm Journal Building and that the aggregate amount owed by WSP to the general partner or any of its affiliates for amounts advanced by any of them to or on behalf of the partnership is $1,300,000. This represented the amount Caplan was due as his share of the profit on the sale of the Farm Journal Building. (Trial exhibit "P-170"). This debt was proper and it was properly paid to Caplan. (N.T. October 6, 2011 174-175; N.T. October 11, 2011 p. 102-103). The journal entries set up a distribution as a loan to Caplan and then payment of loan. (N.T. October 12, 2011 p. 19-20; trial exhibit "D-222").

O. Greystone Refinancing Distribution/Loan to Caplan

Caplan refinanced three or four properties at the same time. One of the properties was WSP. This refinancing was referred to as the Greystone refinancing. (N.T. October 12, 2011 p.107). Caplan entered into a $9,512,000.00 permanent mortgage loan on the 1411 Property with Greystone Servicing Corporation, which net proceeds of $2,343,667.66 were available to WSP for its use. (N.T. October 11, 2011 p. 153; trial exhibit "D-96, 97"). At the same time WSP entered into the refinancing agreement with Greystone, another entity in which Caplan held an ownership interest, L-A 1600 Walnut, L.P., also entered into a financing agreement with Greystone. The mortgage document and assignment of mortgage relating to the financing between Greystone and L-A 1600 Walnut L.P. contained an attached exhibit "A" that included the real property description for 1411 Walnut Street. The mortgage document and assignment of mortgage relating to the financing between Greystone and WSP for 1411 Walnut,

contained an attached "exhibit A" that included the real property description for the property owned by L-A 1600 Walnut, L.P.

There were no cross-collateralization provisions in the mortgage or note documents relating to the financing between Greystone and WSP for 1411 Walnut; nor were there any cross-collateralization provisions in the mortgage documents relating to the financing between Greystone and L-A 1600 Walnut, LP, which would ordinarily be included if there were cross-collateralization enforcement rights available to the lender. The financing commitment letter regarding the financing between Greystone and WSP did not contain any cross-collateralization enforcement rights available to the lender, and it only included reference to an "exhibit A" attached to the document which was the description of the property at 1411 Walnut Street. The filing of the mortgages with confused "exhibit A" attachments was a mistake on the part of counsel for Greystone, who prepared and filed the documents. The Greystone mortgage was paid off with financing from Sovereign Bank in 2007. At no time were WSP funds used to pay the debt at 1600 Walnut Street. Caplan never used the credit from WSP in connection with the Greystone refinancing of other properties in which Caplan had an interest. (N.T. October 12, 2011 p. 108).

At the time of the Greystone financing, WSP did not have any interest in the 1600 Walnut Street. (N.T. October 11, 2011 p. 158). The 2000 WSP original federal tax return showed a distribution to Caplan from WSP of $1,796,334. The amended 2000 WSP federal tax return showed no distribution to Caplan. (N.T. October 3, 2011 p. 49, trial exhibit "P-115-116"). Mr. Peter Gintz testified the "Due to/

From Roosevelt" references in his journal entries (D-222) were a combination of amounts "Due To/From" PMC and Caplan, individually. The journal entries in D-187 reflect the internal adjustments in WSP's books and records based upon Gintz's directions as set forth in D-222, so that the $1.3 million owed to Mr. Caplan was set up as a loan and then marked as paid and the $496,334 distribution from the Greystone refinancing was reclassified as a loan to Mr. Caplan which is still on the books today. (N.T. October 11, 2011 p. 18-20.) From the Greystone proceeds, defendants applied $449,083.53 to the Lubert-Adler loan which was applied to the principal due on the L-A note.

P. The Sweep Account

PMC used one master account for the deposit of all funds from WSP and a number of additional partnerships managed by PMC. (N.T. September 28, 2011 p. 18-19). PMC also maintained separate subaccounts for each partnership. All WSP receipts were recorded on the records of the subaccount and all payments for WSP's debts and obligations were separately recorded on the records of the subaccount. (N.T. September 28, 2011 p. 19). No commingling occurred. (*Id.*) The sweep account is not an interest bearing account. (N.T. September 28, 2011 p. 19). The use of a single cash account with separate accounting controls is an acceptable industry standard.

Proper calculation of any affiliate debt associated with the sweep account should not be based upon the annual ending balance in the account, but upon the average monthly balance. Interest should be calculated at the statutory rate of 6%. Interest should be simple, not compounded monthly. WSP was owed money from

Roosevelt because cash was held from the net deposits less the credits. (N.T. October 6, 2011 p. 151).

Q. Rent from PMC

PMC's offices are located on the third floor of 1411 Walnut Street. Prior to PMC's occupancy, portions of the third floor of 1411 Walnut Street were leased to a third party tenant, Corcel. Portions of the third floor were vacant before PMC leased the balance of the third floor. When Corcel vacated, PMC attempted to find another tenant to lease the vacant space but was unsuccessful. Unable to lease the space to a third party, PMC expanded its use of the third floor and leased the remainder of the space that had been vacated by Corcel. The third floor space is not desirable office space because it is over a restaurant, has a lack of view and shares entrance with residential tenants. The rent paid by PMC represents fair market value for the premises occupied by PMC. (N.T. October 12, 2011 p. 35).

R. Sovereign Bank Refinancing

Effective July 31, 2007, Caplan, on behalf of WSP, obtained a $14,000,000 mortgage refinancing loan from Sovereign Bank, N.A. which in part was utilized to pay off the March 14, 2000 Greystone Mortgage. (Trial exhibit "P-82 to P-89"). After payoff of the Greystone loan and related closing fees and costs, $4,432,380.41 in net proceeds from the Sovereign loan was available to WSP for its use. Caplan received a distribution of $4,303,000 from the Sovereign Bank refinancing proceeds. The Seidman Partnership is entitled to receive a share of the distribution since the proceeds were an asset of WSP. Defendants admit the Seidman Partnership is entitled to

interest on the distribution. (N.T. October 13, 2011 p. 28, 30-31; trial exhibit" D-202 C/D").

S. Inspection of Books and Records.

Upon request, plaintiffs have been provided with all the general ledgers and trial balances relating to the partnership from 2004 to the present. Plaintiffs' expert was provided with full access to the partnership and PMC records.

T. Procedural Background

On September 16, 2008, plaintiffs Jacob Seidman and Merrill Seidman, a Pennsylvania partnership through MS & RS, a successor in interest to Jacob Seidman and WSP filed a complaint and petition for audit and accounting against defendants Ronald Caplan, PMC/Washington Square Partners GP, LLC and Roosevelt's Inc. d/b/a Philadelphia Management. The complaint alleged claims for breach of fiduciary duty and breach of contract against Ronald Caplan, PMC and WSP, conversion and unjust enrichment against defendant PMC and tortious interference with contractual relations, aiding and abetting tortious interference and civil conspiracy against all defendants.

On November 8, 2008, the petition for audit and accounting was withdrawn after a stipulation of the parties was filed and approved by the court. On August 4, 2009, after the filing of preliminary objections, the counts for conversion and tortious interference were dismissed. On January 22, 2010, plaintiffs filed a petition to appoint a receiver. On April 7, 2010, a suggestion of death was filed by defendants for Ruth Seidman.

On October 20, 2010, the court entered an order granting in part defendants' motion for summary judgment and dismissed the claims for historic tax credits, civil conspiracy and aiding and abetting concert of action. On October 20, 2010, the court also entered an order denying plaintiffs' motion for summary judgment. On September 22, 2011, the court denied defendants' petition for abatement for failure to appoint a personal representative. The matter was tried non jury from September 27, 2011 to October 13, 2011.

On August 24, 2012, the court issued findings of fact and conclusions of law. The court found in favor of plaintiff WSP against defendant Caplan on the breach of contract claim. The court ordered Caplan to pay to plaintiff WSP the sum $1,684,842 which represented the interest earned on the Roosevelt fund from 1997 to June 30, 2011.

The court also found in favor of plaintiffs Merrill Seidman, a general partner, and Merrill Seidman and Philip B. Goodman t/a MS & RS Investment Limited Partnership, a general partner, collectively t/a Jacob and Merrill Seidman Partnership and against Caplan on the breach of contract claim. The court awarded plaintiffs the amount of $14,131.00 representing .5% of the interest earned on the Roosevelt fund ($1,684,842) from 1997 to June 30, 2011 which was to be paid by plaintiff WSP from the sum of $1,684,842. The court ordered defendants to compute the interest on the Roosevelt fund for the period beginning July 1, 2011 until the present and pay plaintiffs accordingly.

On the breach of contract claim, the court also found in favor of plaintiffs and against defendant Caplan in the

amount of $27,753.76, representing distributions from the Sovereign Bank refinancing. The court further directed plaintiffs to file with the court a motion to assess attorney fees in accordance with 15 Pa. C.S. § 8594. As to any remaining claims for breach of contract, unjust enrichment and breach of fiduciary duty, the court found in favor of defendants.

Plaintiffs and defendants filed post trial motions. In addition to filing post trial motions, plaintiffs filed a motion to assess reasonable expenses pursuant to this court's instructions. Defendants also filed a motion to require the posting of security. On December 24, 2012, after review of the parties' submissions and after oral argument, the parties' respective post trial motions were denied as well as plaintiffs' motion to assess reasonable expenses pursuant to § 8594 of the Pennsylvania Partnership Act and defendants' motion to require the posting of security.

On February 20, 2013, plaintiffs filed a notice of appeal to the Superior Court. On March 6, 2013, defendants filed a cross notice of appeal to the Superior Court. The court entered an order requiring the submission of statements of matter complained of on appeal. The parties submitted their respective statements in a timely manner.

## DISCUSSION

A. The Court Did Not Err in Permitting the Seidman's Derivative Claim to Continue.

The court did not error in allowing the derivative claim to survive. A limited partner's derivative actions are governed by 15 Pa. C.S. §§ 8591-8594. Section 8591, Right of Action, states:

Under the statute, a limited partner may bring an action in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed. The derivative action may not be maintained if it appears that the plaintiff cannot fairly and adequately represent the interests of the limited partners in enforcing the rights of the partnership.

In this action, a demand upon the general partner, Ronald Caplan, would have been futile since Ronald Caplan is a named defendant in this action. Berger, Billups and Nyberg, limited partners in WSP, were not interested in bringing an action against Caplan, PMC and Roosevelt, Inc. Berger, Billups and Nyberg testified the Seidman Partnership does not represent their interests in this lawsuit. Despite the respective limited partners' lack of interest in bringing this action, plaintiffs fairly and adequately represent their interest in this lawsuit. Plaintiffs' claims and those of the limited partners are not diverse. The limited partners will gain from any recovery plaintiffs receive. Since it appears the Seidman Partnership fairly and adequately represents the interest of the limited partners in the instant action as required by section 8591, the derivative action may be maintained.

B. The Court's Finding that the Seidman Partnership Interest was .5% is Supported By the Record.

Plaintiffs complain the court erred in failing to give legal effect to the integration clause in the amended and restated agreement of the limited partnership. However, the evidence does not support plaintiffs' complaint. The

preamble to the December 1998 agreement acknowledges the Seidman Partnership assignment of their 20% interest to Caplan. The Seidman Partnership agreed to continue to be partners with Caplan in WSP on the reduced interest of .5% in exchange for a tax deferral after the sale of the Farm Journal Building. This assignment was supported by the testimony of Goodman, a witness the court found to be credible. Goodman confirmed his understanding in writing and shared his understanding with Seidman. Seidman never objected to Goodman's understanding. Additionally, the 2006 K-1 form shows the Seidman Partnership interests at .5%. Based on the foregoing evidence, the court did not err in finding Seidman's Partnership interest was at .5%.

C. The Court Did Not Err in Finding Defendants Breached their Fiduciary Duty as to the Roosevelt Fund, the Sovereign Bank Refinance and a Failure to Provide Information Only.

Seidman claimed Caplan, as the general partner and the manager of PMC, had statutory and contractual duties to provide to the Seidman Partnership "true and full information regarding the state of the business and financial condition" of WSP.

Title 15 Pa. C.S. § 8525 (a). Information provides in pertinent part as follows:

(a) General rule. — Each limited partner has the right, subject to such reasonable standards (including, without limitation, standards governing what information and documents are to be furnished, at what time and location and at whose expense) as may be set forth in the partnership agreement, to obtain from the general partners from time to time upon reasonable demand:

(1) True and full information regarding the state of the business and financial condition of the limited partnership.

(2) Promptly after becoming available, a copy of the Federal, State and local income tax returns for each year of the limited partnership.

(3) Other information regarding the affairs of the limited partnership as is just and reasonable.

The 1998 agreement provides:

13.03. Accountants. The Accountants shall annually prepare for execution by the General Partner all tax returns of the Partnership, shall annually review the books of the Partnership, and shall certify, in accordance with generally accepted accounting principles, a balance sheet, a profit and loss statement, and a cash flow statement. A full detained statement shall be furnished to all Partners, showing such assets, properties, and net worth and the profits and losses of the Partnership for the preceding fiscal year.

13.04. Reports to Partners. On or before February 28 of every year, the General Partners shall mail to all Persons who were Partners at any time during the Partnership's prior fiscal year, all tax information regarding the Partnership and its operations during the prior fiscal year which are reasonably necessary to the Partners for the preparation of their tax returns. On or before March 31 of every year, the General Partner shall mail to all Persons who were Partners at any time during the Partnership's prior fiscal year a report of the accountants containing certified financial statements

and a report of the General Partner with respect to the Partnership and its operations during the prior fiscal year. (Trial exhibit "P-9").

Caplan had a duty to provide the Seidman Partnership with a detailed statement showing such assets, properties, and net worth and the profits and losses of the partnership for the preceding fiscal year. Caplan also had a duty to mail to all partners at any time during the partnership's prior fiscal year a report of the accountants containing certified financial statements and a report of the general partner with respect to the partnership and its operations during the prior fiscal year.

Caplan failed to provide the Seidman Partnership with such information. Caplan's failure to provide such information constituted a breach of contract. Caplan's failure to provide the Seidman Partnership with the required information caused Seidman to be deprived of interest on the Roosevelt sweep account and to be deprived a portion of the distribution from the Sovereign Bank refinance.

Moreover, Seidman failed to prove Caplan breached any contract or breached any fiduciary duty as it pertained to the Greystone refinancing. Caplan was entitled to the distribution of $1.3 million from the Greystone refinance in March 2000. The loan to Caplan in the amount of $496,344 from the Greystone refinance was in accordance with § 8.02 (a) of the December 1998 agreement.

The loan to Caplan for $496,344 is included on the books and records of WSP as a receivable. No cross collateralization of the property occurred in the Greystone refinance. Plaintiffs failed to prove that WSP funds from the Greystone refinance were used for the benefit of

any other property owned or controlled by Caplan and therefore plaintiffs failed to prove any breach of duty in connection with the Greystone financing.

Similarly, plaintiffs failed to prove any breach of contract or breach of fiduciary duty for rent and management fees as it pertained to 1411 Walnut Street. Plaintiffs failed to present any credible evidence regarding reasonable rent for the third floor of 1411 Walnut Street. Defendants' expert provided credible rent testimony for the third floor of 1411 Walnut Street. Plaintiffs were provided with books and records for WSP when requested. The management fees and accounting fees paid to PMC were reasonable.

Additionally, there was no evidence presented regarding breach of contract, breach of fiduciary duty or unjust enrichment as it pertained to the Lubert-Adler loan. Any payments to Lubert-Adler were proper. The evidence presented regarding the excessive payments to Lubert-Adler is not credible. WSP did not suffer any damages as a result of the Lubert-Adler loan to WSP. The Lubert-Adler loan was reasonable. The Lubert-Adler loan was an arms length transaction. As such the court did not err in finding a breach of fiduciary duty only as it pertained to the Roosevelt fund, the Sovereign Bank refinance and providing of information.

D. The Court Did Not Err in Finding Plaintiff WSP was Entitled to Interest on the WSP Account.

The court found that Plaintiff WSP was entitled to interest on the WSP account designated "Due to/from Roosevelt, Inc.," the sweep account reflecting WSP's net deposits less disbursements reported in trial balances, general ledgers and tax returns. Defendants admitted

interest is due plaintiffs on the Roosevelt Fund. (N.T. October 13, 2011 p. 12). The interest is an asset of WSP. In awarding the amount of interest, the court finding the testimony and calculations of defendants' expert to be more credible awarded interest in the amount of $1,684,842 for the period 1997 to June 30, 2011. (Trial exhibit "D-202-A"). The Seidman Partnership is entitled to 20% interest income for 1997 and .5% interest income on the Roosevelt Fund for the years 1998 to the present. The Seidman Partnership's share of interest due for the years 1997 to June 20, 2011 is $14,131.00. The interest for the period July 1, 2011 to the present shall be calculated by defendants' expert within ten days of this finding.

E. The Court Did Not Err in Finding Plaintiffs were Entitled to a Portion of the Distribution from Caplan's Share of the Distribution from the Sovereign Bank Refinancing.

Caplan received a distribution of $4,303,000 from the Sovereign Bank refinancing. The Seidman Partnership is entitled to receive its portion of the distribution from Caplan's distribution. The Seidman Partnership's share from the refinance is $21,515.00 ($4,303,000.00 x .5%). The Seidman Partnership is entitled to interest at a rate of 6% from August 2, 2007 to May 31, 2012 on its share of the Sovereign Bank refinance. The amount of interest due the Seidman Partnership from the Sovereign Bank refinance is $6,238.76.

F. The Court Did Not Err in Finding that Plaintiffs Failed to Prove a Claim for Unjust Enrichment against PMC.

The elements of unjust enrichment are "benefits

conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[4] The most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. *Id.* Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. *Id.* PMC only received fees if revenue was generated by the building. Plaintiffs failed to prove that PMC was unjustly enriched.

G. The Court Did Not Err in Finding the Absence of Letters and the Appointment of a Personal Representative was Reasonably Explained by Plaintiffs.

The Pennsylvania Abatement Statute, 20 Pa. C.S. § 3375, Abatement of action for failure to take out letters states:

If a plaintiff...dies and a personal representative is not appointed within one year after a suggestion of such death is filed...any defendant...may petition the court to abate the action as to the cause of action of the decedent...[and][t]he court shall abate the action as to the cause of action of the decedent if the delay in taking out letters is not reasonably explained.

Plaintiffs did not have a personal representative

---

4. *Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664 (Pa. Super. 2007).

appointed and letters of administration were not issued for Ruth Seidman after her death on January 1, 2010.Plaintiffs were not required to appoint a personal representative or raise letters of administration since at the time of Ruth Seidman's death she no longer held an ownership interest in the Seidman Partnership. Florida law did not require the appointment of a personal representative or issuance of letters for her estate for purposes of probate.

Ruth Seidman transferred her interest in the Seidman Partnership on October 28, 2009 to the Ruth Seidman Revocable Trust. Defendants lack standing to challenge the assignment of the Seidman Partnership interest to the Ruth Seidman Revocable Trust. Defendants are not parties to the Seidman Partnership agreement. The absence of letters and the appointment of a personal representative were reasonably explained by plaintiffs, and defendants' request for abatement was consequently denied.

H. The Court Did Not Err in Finding Plaintiffs are Entitled to Recover Reasonable Expenses Including Attorney Fees Solely for the Time Spent on Recovering Interest on the Roosevelt Funds nor Did it Err in Denying Plaintiff's Motion to Assess Reasonable Expenses.

The Revised Uniform Partnership Act provides in part as follows:

(a) General rule. — Except as otherwise prescribed by general rule, if a derivative action under this subchapter is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney fees, and shall direct

him to remit to the limited partnership the remainder of those proceeds received by him. If the proceeds received by the plaintiff are insufficient to reimburse the reasonable expenses awarded to the plaintiff, the court may direct that the award of expenses or a portion thereof be paid by the limited partnership.[5]

Plaintiffs are entitled to interest on the Roosevelt funds from 1997 to the present. Plaintiffs are also entitled to a share of the distribution from the Sovereign Bank refinance and interest on interest on the distribution. The interest on the Roosevelt funds is an asset of WSP. The court may award reasonable expenses, including reasonable attorney fees, to plaintiffs based the award of interest to plaintiffs from the Roosevelt funds. The court ordered plaintiffs submit within ten (10) days from the date of its finding, a motion to assess reasonable expenses including attorney fees in accordance with 15 Pa. C.S. § 8594.

Plaintiffs complied with this request, defendants responded and the court heard oral argument on the motion. After oral argument, the court denied the motion. Plaintiffs' recovery of attorney fees pursuant to 15 Pa. C.S. § 8501 was limited to the time spent in recovering the interest on the Roosevelt fund. Instead of presenting evidence of same, plaintiffs argued that all time spent on the case related and intertwined with collecting the interest on the Roosevelt fund. As such the court found plaintiffs failed to satisfy the requisite burden of proof.

I. The Court Did Not Err in Granting Defendants' Motions in Limine to Preclude Testimony and Expert Testimony Relating to Plaintiffs' Claim for Distribution

---

5. 15 Pa.C.S. § 8594.

Shortage.

Plaintiffs complain this court erred in granting defendants' motion in *limine* to preclude the testimony relating to plaintiffs' claim for distribution shortage and to strike plaintiffs' supplemental expert report relating to plaintiffs' claim for distribution shortage. The court's preclusion of said testimony as well as supplemental expert report relating to the distribution shortage was proper.

On May 16, 2011, the eve of the pre-trial conference, plaintiffs served upon defendants a supplemental expert report asserting a new claim for breach of contract. Plaintiffs allege that in January 1999, WSP breached the original partnership agreement by allegedly failing to pay the Seidman Partnership the full 20% share of partnership distributions in connection with the sale of certain partnership property known as the Farm Journal Building.

This claim for distribution shortage was never plead in plaintiffs' complaint. The complaint alleges the Seidman Partnership in 1998 and 1999 received distributions arising from the sale of the Farm Journal Building, the complaint never alleged that the distributions were in any way deficient or that the Seidman Partnership was entitled to any more distributions. Plaintiffs never amended their complaint to include the claim that Seidman is owed distributions in connection with the sale of the Farm Journal Building. The initial report submitted by plaintiffs' expert John F. Maloney was also silent on the question a shortage. Merrill Seidman also confirmed the Seidman Partnership received its full 20% entitlement from the sale of the Farm Journal Building. The supplemental report issued by Maloney on May 16, 2011 was the first time any

indication was given a shortage existed.

Additionally, the claim for distribution shortage was required to be arbitrated. The claim for distribution shortage arises under the original agreement which provides that partnership distribution arising from the sale of the Farm Journal were to be made in accordance with the partners' respective percentage ownership interest. The original agreement contained an arbitration clause. The court overruled defendants' preliminary objections requesting the action be arbitrated on the ground the court found the claims in plaintiffs' complaint were not subject to arbitration since they did not arise under the original agreement. As such, the court did not err in granting defendants' motion in *limine* to preclude the plaintiffs' claim for distribution shortage.

J. The Court Did Not Err in Denying Defendants' Motion to Post Security.

Defendants moved to require plaintiffs to post security pursuant to 15 Pa. C.S. § 8594 (b). After a hearing on merits of the motion, the court denied the motion. The court found defendants failed to present any evidence to demonstrate plaintiffs' ownership interest had an aggregate fair market value below $200,000. Determination of fair market value is an integral part of determining whether security should be posted. Since the court was not provided with such evidence, the motion was denied.

## CONCLUSION

For the foregoing reasons, this court's order should be affirmed.